David C. Parisi, Esq. (162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (188814)
shavens@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
Telephone: (818) 990-1299

Joseph H. Malley (not admitted)
malleylaw@gmail.com
LAW OFFICE OF JOSEPH H. MALLEY
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100

Alan Himmelfarb (90480)
THE LAW OFFICES OF ALAN HIMMELFARB
80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA 91024
Telephone: (626) 325-3104
consumerlaw1@earthlink.net

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FRANCISCO ESPITIA, VANESSA ZENDEJAS, and JOE A. SANCHEZ FRAIRE, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>HIPSTER, INC.,  a Delaware Corporation;<br><br>Defendant. | CASE No.  3:13-cv-00432-LB<br><br>JURY DEMAND<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.   **Computer Fraud and Abuse Act 18 U.S.C. §1030;**<br>2.   **California Computer Crime Law, Penal Code § 502;**<br>3.   **Trespass to Personal Property / Chattels;**<br>4.   **California Consumer Legal Remedies Act Civ. Code §1750;**<br>5.   **Unfair Competition Law, Business and Professions Code § 17200;**<br>6.   **Conversion;**<br>7.   **Invasion of Privacy and Seclusion; and**<br>8.   **Unjust Enrichment** |

Plaintiffs, FRANCISCO ESPITIA ("Espitia"), VANESSA ZENDEJAS ("Zendejas"), and JOE A. SANCHEZ FRAIRE("Fraire"), (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys Parisi & Havens LLP, the Law Offices of Alan Himmelfarb, and the Law Office of Joseph H. Malley, P.C., bring this action on behalf of themselves and all others similarly situated against Defendant Hipster, Inc.. Plaintiffs' allegations as to themselves and their own actions, as set forth herein, are based upon their information and belief and personal knowledge, and all other allegations are based upon the investigations of counsel. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) as set forth below.

## I.     NATURE OF THE ACTION

1.      "App" is short for application software.  A mobile application (or mobile app) is a software application designed to run on smartphones, tablet computers, and other mobile devices.  Mobile apps are typically obtained through application distribution platforms, operated by the owner of the mobile operating system, such as the Apple App Store.

2.      Defendant Hipster, Inc., developed and distributed a mobile app through the Apple App Store.  The mobile app, "Hipster" ("Hipster App" or "App"), promoted its App as follows:

> "Easily share where you are and what you're doing with postcards of your photos."

3.      The Hipster App, however, did more than provide a way for users to make postcards out of their pictures and share them.  Undisclosed to users, once the Hipster App was downloaded to a user's iPhone, the App instantly rooted through the iPhone, copied the user's contact address book contact information, and, without any notification whatsoever to the iPhone's owner, uploaded that private and personal information to Hipster's web servers.

4.      At no point in this process were users informed that this copying, uploading, or storage by Hipster of this private and personal information would occur, was occurring, or did occur.  No consent of any type was sought by the Hipster App.

5.      This copying, uploading, and storage of contact address book contact information

took place regardless if the user selected the most restrictive and private settings that the Hipster App offered.  This copying, uploading, and storage of contact address book contact information took place regardless if the user selected the most restrictive and private settings that the iPhone itself offered.  The Hipster App was designed to ignore and override privacy settings on the iPhone itself, uploading this private data even when privacy settings were set to insure that this data would never be shared.

6.     Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), on behalf of themselves and a proposed class of similarly situated Individuals, (hereinafter referred to as the "Class"), who were victims of unfair, deceptive, and unlawful business practices; wherein their property, privacy, and security rights were violated by Defendant Hipster, Inc.

## II.     PARTIES

7.     Plaintiff Vanessa Zendejas ("Zendejas") is a resident of Dallas County, Texas.

8.     Plaintiff Francisco Espitia ("Espitia") is a resident of Dallas County, Texas.

9.     Plaintiff Joe A. Sanchez Fraire("Fraire") is a resident of Dallas County, Texas.

10.     Defendant Hipster, Inc. was a privately held Delaware corporation headquartered at 650 Page Mill Rd, Palo Alto, CA 94304.  Hipster operates an internet business as a smartphone-based social network utilizing an application software that performs specific functions for a web-based platform on mobile devices. Launched in January 2011, Hipster was located online at https://hipster.com/ Hipster is located within the Apple iTunes store at: https://itunes.apple.com/us/app/hipster/id461983020?mt=8Hipster  and in the Android Market at: http://www.androidtapp.com/hipster/

## III.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter this action pursuant to 28 U.S.C. § 1331.

12.     This Court has jurisdiction over Defendant Hipster because it is a corporation headquartered in San Francisco County, California, and is a citizen of the state of California.

Plaintiff asserts claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories. There is minimal diversity of citizenship between proposed Class Members and Defendant.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Hipster is a corporation headquartered in San Francisco County, California, and/or because the improper conduct alleged in this Complaint occurred in, was directed from, and/or emanated from this judicial district.

**IV.     INTRADISTRICT ASSIGNMENT**

14.     Pursuant to Local Rule 3-5(b) and 3-2(c), this action should be assigned to the San Francisco Division of the Northern District of California because Defendant resides in San Francisco.

15.     This Complaint details these allegations, the statutory and common law remedies Plaintiffs seek for these wrongs, including injunctive remedies and accountability for those entities responsible.

**V.     FACTS**

16.     The Hipster App was launched in October 2011.  The Hipster App was made available through the Apple App Store for iPhone users.

17.     The Hipster App was promoted as an image sharing service, which facilitated sharing of images across services, including social services like Facebook, Tumblr, Twitter, Foursquare, or Hipster's own website.

18.     The App permitted modification of images though the addition of frames and filters, to make the image look like an old-style postcard.

19.      Immediately upon establishing the account, the Hipster App, automatically and without notification or consent, uploaded contents of the user's contact address book to the Hipster servers, including all listed email addresses.

The Contact Address Book

20.     A contact address book is a database within computing devices for storing entries

called "contacts." Each contact consists of a few standard fields of data, including but not limited to, contact names, e-mail addresses, instant message screen names, phone numbers, job employer, addresses, websites, birthdays, and notes.

21.     The contact address book is one of the most private and personal files a user maintains on their iPhone.  The contact address book reflects the connections, associations, and relationships that are unique to the owner of the iPhone.  Not just which organizations the user belongs to, but which organizations the user actually communicates with on a regular basis.  Is the user seeing a doctor?  A psychiatrist?  A specialist in the treatment of personal and potentially embarrassing conditions? What political, social or religious organizations is the user associated with?  All of this information, and more, is revealed if an examiner can gain access to a user's contact address book.  The contact address book answers a fundamental question with hard evidence:  Who is this person communicating with?

22.     The iPhone comes with pre-installed software, permitting the user to enter certain categories of information related to the use of the iPhone.  When the owner first receives the iPhone, all of the contact fields for the contact address book are blank.

23.     In order to utilize the contact address book, the user must either have preexisting knowledge or must undertake some level of research, study, and self-learning in order to gain sufficient knowledge and skill to take advantage of the capabilities and parameters of the contact address book functions.

24.     In addition, to utilize the contact address book, the user must individually mark or key in or input entries for each of the contact address book fields, utilizing the touch screen key pad on the iPhone, or they can import the contacts that they created on their computer.  Any creation of an address book would take at a minimum several seconds. Each individual entry requires time and investment of work and resources on the part of the user.

25.     A user's contact address book is a creative work on the part of the user.  Like fingerprints, practically no two contact address books are identical. In fact, each contact address book is unique and personal to the owner of the iPhone.  Though each contact address book may consist of nothing more than simple names and telephone contact numbers (although more

detailed information may be added), the compilation of that user's particular or selected contacts is a unique creative process tailored to the specific needs and judgments of the user.

26.     Additional field information, such as what to include in the "name" field, or what additional information to input in the "notes" field, is all an individual creation as a result of work undertaken by the user to tailor the iPhone and its contact address book function to his or her own specific and particular needs and desires.

27.     Which relationships the user selects to make available within the iPhone's contact address book reflects that particular user's choice of which relationships in the user's life merit special treatment (instant contact accessibility).

28.     In other words, each iPhone contact address book is a creative effort involving choice, individual assessment, judgment, and creative effort, unique to the individual.

29.     These choices of the individual, which are collectively incorporated into the totality of the contact address book in the iPhone, are highly personal and private.  Contact address books are not shared, are not publicly available, are not publicly accessible, and are not ordinarily obtainable unless the user physically relinquishes custody of his or her iPhone to another individual.

30.     The investment of time, effort, skill, and creative energy used to build the user's unique contact address book has independent value.  The investment made by a user to create their contact address book is substantial, and capable of valuation, based upon the time spent learning and building the contact address book, time spent creating and inputting data and information, the number of entries in the contact address book, and time spent modifying and updating the contact address book.  For any U.S. citizen, the investment of time cannot be valued at less than $7.25 per hour (U.S. minimum wage) or some similar amount subject to proof at the time of trial.  Thus, even ten seconds of entry time to create a single contact in a contact address book cannot be valued at less than 1.2 cents per entry.  Taking into account the time each user necessarily spent in learning, building, modifying, and updating a contact address book, times the number of entries an address book contains on average, the investment of time actually exceeds by many orders of magnitude the minimum estimate of 1.2 cents of investment in

1    creating a contact address book.

2         31.    The cost to hire a technician to assemble the data and information contained in a

3    contact address book is substantial.  The technician would need to be familiar with the Apple

4    iPhone (proficient in the use of the device), knowledgeable regarding the particular version of

5    the contact address book supported by that particular iPhone, obtain the basic data and

6    information from the user, and undertake the task of assembling and configuring the contact

7    address book so that the final product fits the needs and desires of the user. These are skills that

8    are available in the marketplace, but they would cost the user real dollars in order to employ a

9    technician to undertake the task of creating or assembling the contact address book.  In no case

10   would it cost less than $7.25 in value (U.S. minimum wage at one hour of invested time), or

11   some similar amount subject to proof at the time of trial, to hire and retain a knowledgeable

12   technician to undertake the task of building, modifying, and/or updating a contact address book.

13        32.    The contact address book is a product that has independent value in the

14   marketplace. Companies that wish to obtain access to an individual's contact address book are

15   ordinarily required to offer the user something of such value or use, such that the individual is

16   presented with a fair choice about whether to permit access to the contact address book in

17   exchange for what is being offered.  In such a case, the user is presented with a clear choice:  in

18   order to obtain the thing of value, the user will be required to provide the offering company

19   access to the user's contact address book.  Because information contained in the contact address

20   book is ordinarily of such private and personal value to the user, the proposed exchange must

21   ordinarily meet some minimum threshold of use or value to the user in order to persuade the user

22   to open up their contact address book to the offering party.

23        33.    The contact address book has independent value, not only to the user, but also to

24   businesses engaged in profiting from and exploiting social media through advertising.  The

25   contact address book reveals not merely theoretical connections between people, but the actual

26   real-world connections that people engage in.

27        34.    That information has independent value in the marketplace.  For example,

28   Facebook, has built a multi-billion dollar business based upon the personal, real-world

First Amended Class Action Complaint

1    connections between people.

2        35.    Target marketing companies spend millions of dollars compiling information on

3    the relational connections between people in their databases.  The data they collect and compile

4    is a commodity that they sell to businesses hoping to reach specific target audiences.

5        36.    Lists of addresses, telephone numbers and email addresses are commodities that

6    are available for sale in the marketplace.  Companies pay substantial sums for the right to market

7    to a viable, verified list of current names, telephone numbers, and email addresses.  On

8    information and belief, and Plaintiffs thereupon allege, the value of the contents of a single

9    contact address book, whether sold separately or sold in aggregation with other contact address

10   books, would be not less than 1 cent per contact address book.

11       37.    Hipster did not disclose to iPhone users that the user's contact address book

12   would be copied and uploaded to Hipster's servers. Beginning in October 2011, and continuing

13   from the date of the introduction of the App up until at least February 2012, Hipster did not

14   inform any users that the contact address book would be copied, uploaded, or retained.

15       38.    Between October 2011 and February 2013, it was reported that Hipster enticed

16   over 500,000 mobile device users to download the Hipster App.

17       39.    From the time the Hipster App was made available until approximately February

18   2012, the Hipster App, without notice or consent to any user, immediately upon signing up,

19   uploaded the contents of the user's contact address book to its servers, and retained that

20   information.  In this manner, Hipster thus obtained the email addresses contained in the iPhones

21   of half-a-million users.  If the average number of contact address book entries per user was even

22   a low as twenty entries per iPhone (some users report over 10,000 contacts – there appears to be

23   no maximum number of contacts that an iPhone can store), Hipster, in a period of less than three

24   months, obtained more than 10 million email addresses without anyone outside the company

25   realizing or understanding what Hipster had acquired.

26   The Hipster App

27       40.    When Hipster introduced its App on the internet, it did so with the following

28   language:

Hipster is creating a real-time, visual public record of the world's locations.

Using their iPhones and Android devices, people share where they are and what they are doing by sending their friends a photographic postcard. The postcards become permanently attached to the locations they were sent from, and are forever accessible to all those who come later.

41.     The App was represented to be "free."

42.     In fact, the Hipster App was not "free." Contrary to Hipster's representations, users paid a significant, though completely undisclosed, price for the App.

43.     Essentially, and literally, Hipster "stole" the contact address book, not only of the Plaintiffs, but of millions of additional users.

44.     The app that Hipster users downloaded was represented to them to be "Easily share where you are and what you're doing with postcards of your photos."

45.     Instead, the App was a Trojan horse– one that allowed Hipster to collect millions of email addresses from its unsuspecting users, without ever having to go out in the marketplace to buy those contacts, if such a list could even be had at any price.

46.     By stealing contact information, Hipster was able to achieve a remarkable and unprecedented benchmark within the hot and developing social networking community. Within a half a year of its launch, Hipster had become a company that was valued in the low millions. That valuation was made concrete when, on information and belief, AOL paid a sum in excess of $1 million to purchase the company. On information and belief, and Plaintiffs thereupon allege, the value of the contacts and connections Hipster acquired by stealing the contact address books of hundreds of thousands of its customers was instrumental in achieving that million plus dollar valuation.

47.     When Hipster took a user's contact address book, the user was not notified that the contact address book was part of the bargain. All users were presented with was vague information about the benefits and attributes of the Hipster App. In none of those descriptions, were users informed that the contact address book was the quid pro quo for the downloaded App. Other iPhone apps were forced to offer more value when they disclosed that the contact address book was part of the price for use of the App. In this way, Hipster cheated the user (and other

First Amended Class Action Complaint

9

1   apps that told the truth) by not disclosing the true cost of the use of the Hipster App.

2        48.    Had users known the true costs of the Hipster App, they would not have agreed to

3   download the App.  The users' investment in time, energy, and creativity to build and maintain

4   their contact address book was worth far more money than the Hipster App ostensibly traded for.

5   Thus, users were deprived of the true measure of benefits that their contact address book

6   information could have been exchanged for.

7        49.    Users owned all copyrights to their contact address book.  User's had sole

8   discretion over whom to grant the right to copy their contact address book to.  When Hipster

9   stole their contact address book without notice, and without fair or adequate compensation, users

10   were deprived of value that their creative work embodied.

11        50.    When Hipster made a copy of each user's contact address book, users lost their

12   copyright -- the actual, exclusive and personally-owned right to make a copy thereof, and to

13   prevent others from making a copy thereof.   Hipster took that right away from iPhone users

14   when it stole a copy of the contact address book and uploaded that data to its servers. This loss of

15   the exclusive right to make and control rights over a copy of a copyrighted work is tangible, and

16   subject to valuation, but in no case is the loss of this right worth less than $5.00 for each of the

17   iPhone owners who had their contact address book copied without their permission by Hipster.

18        51.    When users purchased their iPhones, it was with the understanding that the

19   iPhone came with certain safeguards for privacy and security, both internal to the iPhone, and

20   external, through the control of the Apple server, and Apple's strict control over its App Store.

21        52.    Apple made representations that users relied upon in purchasing and valuing the

22   purchase of their iPhones, including the representations that Apple "takes precautions—

23   including administrative, technical, and physical measures—to safeguard your personal

24   information against theft, loss, and misuse, as well as against unauthorized access, disclosure,

25   alteration, and destruction."

26        53.    These ostensible protections were material to iPhone purchasers, and supported

27   the premium price paid by purchasers to become an owner of an iPhone.

28        54.    Hipster's conduct in overriding these ostensible protections to the users' privacy

and security devalued the iPhone for its users.  Users would not have purchased Apple's iPhone, or alternatively, would not have paid as much for it had they known that the Hipster App would circumvent both internal and external safeguards designed for the protection of their private and personal information residing on the iPhone.

55.     Because users were tricked into downloading the Hipster App, believing that the price and consequences of the downloaded App were different than Hipster represented they were, any use of the Hipster App was achieved by and through fraud and deception. All use of the Hipster App after being downloaded by users was based upon the intentional dissembling by Hipster of the App's true cost.

56.     Based upon this deception by Hipster, iPhone users lost storage space on their iPhone:  storage space which could have been utilized instead for a legitimate App that had disclosed its true costs of use.  Thus, the false pretenses under which the Hipster App was downloaded caused actual harm:  the diminution of the actual value of an iPhone that had the Hipster App installed upon it which overrode privacy and security settings and protections built into the ordinary use of the iPhone. Had users known of Hipster's ability to override and ignore these privacy and security protections, they would not have purchased the iPhone, or they would not have paid as much for it.

57.     Based upon this deception by Hipster, iPhone users incurred impaired battery life, in that each use of the Hipster App (both its known and unknown features) utilized the battery each time it was active on the iPhone.  The iPhone battery is not an infinite resource. The battery must be regularly recharged.  It may not, however, be infinitely recharged.  The charge and discharge cycle of the battery causes chemical changes in the active battery material, diminishing the battery's storage capacity and requiring even more frequent recharging.  Thus, each activation of the Hipster App and its access and utilization of the finite iPhone battery power, for both disclosed and undisclosed functions, contributed directly to the ultimate demise of the battery. iPhone users could have instead utilized their finite battery life for a legitimate App that had disclosed the true costs of its use.  Thus, the false pretenses under which the Hipster App was downloaded, installed, and run on the user's iPhone caused actual harm in the diminishment of

1   the life of the battery for the iPhone.

2        58.   Based upon this deception by Hipster, iPhone users face the necessity of expert

3   removal of the Hipster App from their iPhones.  The costs to hire a technician who can

4   knowledgeably, effectively, completely, and permanently remove the Hipster App, and all its

5   code, both disclosed and undisclosed, is substantial.  The knowledge required from such an

6   operation is not easily obtained outside of Apple itself.  Thus, the false pretenses under which the

7   Hipster App was downloaded, installed, and run on the user's iPhone caused actual harm to users

8   in necessitating expensive expert removal of the Hipster App and all of its code, both disclosed

9   and undisclosed, from the iPhone in order to restore the iPhone to its previously secure state.

10       59.   When users downloaded the Hipster App, they downloaded it with the

11  understanding that they were installing an App that permitted "Easily share where you are and

12  what you're doing with postcards of your photos."  On that basis and with that understanding,

13  users gave permission to install the App software on their iPhones.

14       60.   Users were not informed, and thus never did, nor could they have, given

15  permission for Hipster to copy, upload, store, and retain a copy of material in their contact

16  address book.  Thus any permission that was granted by the iPhone user to Hipster, permitting

17  access to the user's iPhone for the specific and limited purpose of installing an App that would

18  permit "Easily share where you are and what you're doing with postcards of your photos." was

19  grossly exceeded by the undisclosed actions that Hipster undertook once it was permitted to

20  access the iPhone.

21       61.   Contact address books are stored in the memory of the user's iPhone.  The user

22  has the option to create a duplicate copy on a personal, stand-alone system (syncing) which they

23  control, but in all cases, the contact address book is not otherwise shared, transmitted, broadcast,

24  or otherwise divulged on publicly accessible channels.  Unless the user physically relinquishes

25  custody of his or her iPhone to another individual, without express permission, no one other than

26  the iPhone's owner ever has access to the contact address book.

27       62.   Hipster violated this exclusive control when it took, without notice, the contact

28  address book and uploaded it to its servers.  The Hipster App did not bother with any type of

First Amended Class Action Complaint

encryption. The copying and transmission of the contact address book from the iPhone to the Hipster servers was effected "in the clear."  When Hipster transmitted a copy of the user's contact address book "in the clear," which means it was done without any encryption whatsoever, the user's contact address book was publicly disclosed.  Any and all strangers who monitor web transmissions had complete and unrestricted access to unencrypted transmissions that utilized "in the clear" transmissions.

63.     The design of the iPhone, and specifically, the iPhone design that stores, accesses, and utilizes the contact address book exclusively within the physical boundaries of the iPhone unit itself is a central component of the iPhone function.  This functionality insures that the contact address book remains within and under the complete control of the iPhone owner.  This functionality insures that the contact address book retains its confidentiality.

64.     When Hipster copied, uploaded and stored the contact address book to its servers in the cloud, Hipster broke these aspects of the iPhone's functionality.  Once Hipster copied, uploaded and stored the contact address book on its servers in the cloud, the functionality of the iPhone's design that deals with the iPhone's contact address book was broken, in at least two respects: First, the iPhone was designed to keep the contact address book under the complete control of the iPhone owner.  Second, the iPhone was designed such that the contact address book would stay safely, securely, and confidentially within the confines of iPhone hardware. Both of these design aspects of the iPhone were destroyed by Hipster's App.

65.     Plaintiffs and Class Members expended money, time, and resources investigating and attempting to mitigate their iPhones' diminished performance

66.     Defendant's conduct caused outrage, mental suffering, and harm to Plaintiffs' and Class Members' privacy expectations.

67.     Individuals that downloaded the Hipster App must now request Defendant remove their data from its servers. Individuals that never downloaded Defendant's app, but are named within Plaintiffs' and Class Members' contact address book data will have no notice of the Defendant's action so as to request Defendant to delete their personal information.

68.     The Defendant's actions were surreptitious, and so were conducted without

1    authorization and exceeding authorization.

2        69.    Plaintiffs were not made aware of, nor did they consent to the taking of this data,

3    and there was no way to opt out of this surreptitious collection of information. The information

4    collected included but was not limited to: a Plaintiff' contacts and the interactions with their

5    contacts.

6        70.    As a result, Plaintiffs had the resources of their iPhones consumed and diminished

7    without permission. Such resources were measurable and of actual value, and included iPhones

8    storage, battery life, and bandwidth from Plaintiffs' wireless services provider. The monetary

9    value of the resources taken from Plaintiffs are quantifiable. The rate at which battery charge was

10   diminished on the iPhones as a result of the Defendant's actions was material to Plaintiff,

11   particularly given the power resource constraints on the iPhones: the Defendant's repeated

12   actions during App executions utilized a portion of battery capacity with each action due to the

13   power requirements of CPU processing, file input and output actions, and Internet connectivity.

14   The Value of Personal Information in the Market

15       71.    The monetary and trade value of the information that Defendant took from users

16   is well understood in the e-commerce industry.  Personally identifiable information ("PII") is

17   now viewed as a form of currency.  Professor Paul M. Schwartz noted in the Harvard Law

18   Review:

19           Personal information is an important currency in the new millennium.
             The monetary value of personal data is large and still growing, and
20           corporate America is moving quickly to profit from the trend.  Companies
             view this information as a corporate asset and have invested heavily in
21           software that facilitates the collection of consumer information.[1]

22       72.    Another recent article put the point even more succinctly: "PII is now a

23   commodity that companies trade and sell."[2]

24   ─────────────────────

25   [1] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57
     (2004).

26
27   [2] John T. Soma, et al., *Corporate Privacy Trend: The 'Value' of Personally Identifiable
     Information ("PII") Equals the 'Value' of Financial Assets,* XV RICH. J.L. & TECH. 1 (2009)
     ("Soma Article"), at 1 (citing C. Ciocchetti, *The Privacy Matrix*, 12 J. TECH. L. & POL'Y 245,
28   247 (2007); M. Kightlinger, *The Gathering Twilight? Information Privacy on the Internet in the*

First Amended Class Action Complaint

73.     The Soma Article further states: "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[3]

74.     Likewise, in the Wall Street Journal, privacy expert and then-fellow at the Open Society Institute, Christopher Soghoian, confirms the incentive for the Defendant's actions in taking users contact address books:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data.  Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information.  Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online.
>
> Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[4]

75.     The cash value of personal information can be quantified.  For example, in a recent study authored by Tim Morey, researchers studied the value that 180 Internet users placed on keeping personal data secure.  Contact information was valued by the study participants at approximately $4.20 per year.  The chart below summarizes the findings:[5]

---

*Post-Enlightenment Era*, 24 J. MARSHALL J. COMPUTER & INFO. L., 353, 384 (2006)).
[3] *Id.* at 2.

[4] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, WALL ST. J. (Nov. 15, 2011), *available at*, http://online.wsj.com/article/SB10001424052970204190704577024262567105738.html.

[5] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND, (Jan. 18, 2011), http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html .



76.     Facebook's initial public stock offering also demonstrated the market value of PII. A February 15, 2012 article in *The Financial Times* stated: "Two weeks ago Facebook announced an initial public offering that could value the company at up to $100 [billion]. Facebook is worth so much because of the data it holds on its 845 [million] users."[6]

77.     Moreover, active markets exist all over the world for this type of data.  For instance, a company in the United Kingdom, Allow Ltd., has created a business model based on the value of personally identifiable information.  When a customer signs up for Allow Ltd. the company sends a letter on behalf of its new client to the top companies in the United Kingdom that harvest personal data demanding that those companies immediately stop using the client's personally identifiable data.

78.     A February 28, 2011 Wall Street Journal article stated that Allow, Ltd. paid one user $8.95 for permitting Allow to tell a credit card company that the user was looking for a new

---

[6] Richard Falkenrath, *Google Must Remember Our Right to be Forgotten*, Fin. Times (Feb. 15, 2012), http://www.ft.com/cms/s/0/476b9a08-572a-11e1-869b-00144feabdc0.html#axzz2F4G7Qqnv.

credit card.[7]  Allow is one of a number of companies that offer users a real market for their personal information.  That same Wall Street Journal article described the new company IntelliProtect.  Demonstrating further the clear attribution of specific dollar values to PII, for a fee of $8.95 per month IntelliProtect prevents users from seeing ads based on private information.[8]

79.    Another start-up, Enliken, "enables people to sell themselves to advertisers directly," and values a user's data at $12 per year.  This again illustrates a market in which users can actually sell Personally Identifiable Information, indicating that its value can be realized.[9]

80.    The company Privacy Choice has a program called PrivacyFix, which measures the value that users are paying for the exchange "where companies are able to take user data, sell it to advertisers, and make money that allows them to give themselves a paycheck while keeping [users] afloat in free digital services."  PrivacyFix measures users' last 60 days of activity on Google, extrapolates it to a year, and uses a value-per-search estimate.  Privacy Choice's founder, Jim Brock, boasts that his Google value "checks in at more than $700 per year."[10]

81.    The market highly covets personal user data because such private information is not readily available.  Defendant discovered a way to get this personal information without having pay users anything.

## VI.    RULE 9(b) ALLEGATIONS

82.    Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or

---

[7] Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, WALL ST. J. (Feb. 28, 2011), *available at,* http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[8] *Id.*

[9] Melissa Knowles, *Startup Gives Users Control Over Sale of Personal Data*, YAHOO! BLOG (October 3, 2012), http://news.yahoo.com/blogs/trending-now/startup-gives-users-control-over-sale-personal-data-194752267.html.

[10] Joe Mullin, *How Much Do Google and Facebook Profit From Your Data?*, ARS TECHNICA, (Oct. 9, 2012),  http://arstechnica.com/tech-policy/2012/10/how-much-do-google-and-facebook-profit-from-your-data/.

First Amended Class Action Complaint

mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Fed. R. Civ. P. 9(b).  As detailed in the paragraphs above, Plaintiffs have satisfied the

requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

WHAT:

83.     Defendant Hipster made the following material misrepresentations regarding its

Hipster App:

> Hipster is creating a real-time, visual public record of the world's locations.
> Using their iPhones and Android devices, people share where they are and what they are doing by sending their friends a photographic postcard. The postcards become permanently attached to the locations they were sent from, and are forever accessible to all those who come later.

84.     These statements were misrepresentations because they did not tell the truth about

what the Hipster App was, how it worked, and what it would do.  What was portrayed as an App

to share pictures, in fact, concealed what was essentially a Trojan horse which engaged in

surreptitious data collection practices immediately upon use. Users who sought to obtain a photo

sharing App ended up with a program on their iPhones that accessed places on the iPhone

memory.  This activity was never disclosed to the iPhone users.  Users were not told that the App

would make a copy of their contact address book, upload that contact address book to Hipster's

servers, and that Hipster would retain and use a copy of that secretly acquired information.

85.     When Hipster represented that the app was "free," it was engaging in a

misrepresentation.  The App was designed to hide the true price users would pay.  In exchange

for the Hipster App, users were required to relinquish a copy, and surrender their copyright, of

their contact address book, a transaction which they would not have permitted had they been

informed of the true cost of the Hipster App.

86.     When Hipster represented that the download was "free," it was engaging in a

misrepresentation.  The download included within it a mechanism for extracting a price from the

user (the user's contact address book).  All of this was undisclosed and the user was not given all

information necessary to fairly and honestly evaluate whether the App was really worth the

download.   Thus, the download was not free.  The download was specifically designed to hide

the fact that a price was being extracted from the user without the user's knowledge or consent.

WHEN:

87.     On or about October 2011, Defendant made its Hipster App available through the Apple App Store.   In its announcement, Hipster made the representations discussed above. Thereafter, and for the entire period for which App was available on the market and the App functioned to copy and transmit the contact address book, Hipster continued to represent that its App was "free," and the download was "free," and never, during that time period, did Hipster disclose the true cost of the download or use of the App, or how the App ensured that users would pay the price for the App.  In addition, for the entire time period from October 2011 up to and including some time on or about February 2012, Hipster continued to make incomplete and deceptive statements about the App, concealing its true actions and activities once it was started.

88.     During the time period from October 2011 up to and including some time on or about February 2012, Defendant continuously and uninterruptedly made identical representations that the App was free and continuously and uninterruptedly did not disclose the true nature, facts, and operations of its Hipster App.

WHERE:

89.     The representations were made, *inter alia:*  in the Apple App store which advertised and promoted the Hipster App; on Hipster's home page website which advertised and promoted its Hipster App; and throughout the internet as promoted and propagated by Defendant on numerous web pages located on third-party websites.

WHO:

90.     Defendant Hipster, acting through its employees and/or agents, created, reviewed, approved, and published each of the above-identified statements.  The individual employees at Hipster who had responsibility for the statements are unknown at this time, however internal records of the corporation will permit specific individuals to be identified through discovery. The specific employees of Hipster who had specific responsibility can be identified as those individuals who created, reviewed, approved, and directed or participated in the publication of the statements, and those individuals who had authority to correct, retract, amend the statements, and/or disclose additional information, but did not.

HOW:

91.     Defendant's written material misrepresentations were published in the Apple App Store which advertised and promoted the Hipster App; on Hipster's home page website which advertised and promoted its Hipster App; and throughout the internet as promoted and propagated by Defendant on numerous web pages located on third-party websites.   Any information published and promoted by Hipster was misleading because none of it told the whole truth.  Any person researching information on the Hipster App would not have been able to discover the true nature of the App because Hipster never disclosed the true nature of the App in any of its advertising or statements about its product.  The most minimal research on Hipster's App invariably exposes the prospective downloader to the App statements listed above, which were identical in all iterations.

WHY:

92.     Defendant engaged in the material misrepresentation detailed herein for the express purpose of inducing Plaintiffs and other reasonable iPhone owners to download the Hipster App from the Apple store.  By prominently touting the free nature of the App and the free download, Hipster hoped that it would distribute more copies of its App onto the iPhones of more users.  This strategy was successful, in that Hipster was able to boast that, in less than a year after its unveiling, Hipster had surpassed 500,000 users.

93.     As a result of this explosive growth, which could not have occurred had Hipster disclosed the truth about the App download and function to its users, Hipster was shortly to be valued as a multi-million dollar company.  On information and belief, and Plaintiffs thereupon allege, the value of the contacts and connections Hipster acquired by stealing the contact address books of hundreds of thousands of its customers was instrumental in achieving that multi-million dollar valuation.

MATERIALITY

94.     Defendant Hipster's representations and omissions regarding its Hipster App led users to believe that the App was free, was a way to "Easily share where you are and what you're doing with postcards of your photos."   This resulted in users making the decision to download

the App onto their iPhones and thereby exposing the user's contact address book to Hipster's software program which then copied, uploaded, and retained a copy of the contact address book on Hipster's servers.  These statements hid the true cost and functionality of the Hipster App. Class members would not have downloaded the App had they known these facts.   Defendant profited by promoting its App to hundreds of thousands of unsuspecting users.

95.     Had Plaintiffs and the members of the Class known that the Hipster App would act as it actually did, they would not have downloaded it.

Plaintiffs' Experiences

96.     Plaintiffs Espitia, Zendejas, and Fraire each store contact address data that contains information related to one (1) or more personal contacts, personal associations, business contacts, and professional contacts.

97.     Plaintiffs Espitia, Zendejas, and Fraire each downloaded and used Defendant's App during the Class Period.

98.     Plaintiffs Espitia, Zendejas, and Fraire each used their iPhones to access Defendant's App to use its services, including uploading and sharing digital content, such as photos.

99.     Plaintiffs Espitia, Zendejas, and Fraire each were subjected to the unauthorized access, use, dissemination, collection, and storage of personal information by Defendant.

100.     Plaintiffs Espitia, Zendejas, and Fraire were each unaware of the harm that would be imposed on them  by Defendant, including use, retention and storage of their iPhone contact address books, the misappropriation of their iPhone resources and bandwidth, as well the exploitation of their personal information.

101.     Plaintiffs Espitia, Zendejas, and Fraire did not consent to having their data collected by Defendant. Had Plaintiffs known of Defendant's practices, they would not have downloaded and used its App. Plaintiffs were induced to download and use Defendant's App and the promise of a free safe, and reliable App; Defendant induced Plaintiffs to download and use its Hipster App by offering a service as a "free" App. However, Defendant failed to disclose to Plaintiffs that its "free" App would obtain and store their mobile device contact address book on

First Amended Class Action Complaint

1    it servers.

2        102.    Plaintiffs Espitia, Zendejas, and Fraire were not aware that Defendant would

3    allow information transmitted through Defendant's App in an unreasonably insecure manner—

4    contrary to accepted standards—and in a way that is well-recognized to be easily intercepted by

5    even an unsophisticated hacker sitting near a wireless hotspot.

6        103.    Plaintiffs Espitia, Zendejas, and Fraire considered his or her personal information

7    to be private property and/or a confidential asset.

8        104.    Plaintiffs Espitia, Zendejas, and Fraire had no means to avoid the data collection

9    by Defendant: Defendant controls its ecosystem and what its App can and cannot transmit and

10   Defendant controls the fact that its customers are kept oblivious about the contact address book

11   collection and storage process built into its ecosystem.

12       105.    Plaintiffs Espitia, Zendejas, and Fraire could not learn about copying, uploading

13   and storage of their contact address book data except through unreasonably burdensome efforts,

14   such as those required in the investigations underlying these allegations.

15       106.    Plaintiffs' explicit privacy settings to the contrary, on information and belief,

16   Defendant continues to store information about Plaintiffs, ignoring as a result that Plaintiffs

17   could not prevent Defendant from collecting data. Defendant's representations to the contrary

18   were false and/or misleading, and likely to deceive consumers targeted by such conduct.

19       107.    Plaintiffs Espitia, Zendejas, and Fraire each have standing to bring this case under

20   Article III of the United States Constitution by virtue of alleging concrete, tangible and non-

21   speculative injuries in fact, arising from violations of Federal statutes and the California

22   Constitution. The statutes and Constitutional provisions at issue herein create legal rights, the

23   invasion of which creates standing.

24   **VII.    CLASS ALLEGATIONS**

25       108.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) on

26   behalf of themselves and the following class:

27              All persons residing in the United States that downloaded Defendant
                Hipster's App to their mobile computing devices from January 2011 to

28

February 28, 2012.
Excluded from the Class are Defendant, its legal representatives, assigns, and successors, and any entity in which Defendant has a controlling interest. Also excluded is the judge to whom this case is assigned and the judge's immediate family.

109. Plaintiffs reserve the right to revise this class definition based on facts they learn as litigation progresses.

110. Plaintiffs reserve the right to establish sub-classes as appropriate.

111. The Class consists of hundreds of thousands of individuals and other entities, making joinder impractical.

112. The claims of Plaintiffs are typical of the claims of all other Class Members.

113. Plaintiffs will fairly and adequately represent the interests of the other Class Members. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class Members.

114. Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

115. Defendant has acted, and failed to act, on grounds generally applicable to Plaintiffs and the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

116. The factual and legal bases of Defendant's liability to Plaintiffs and to the other Class Members are the same, resulting in injury to Plaintiffs and all of the other Class Members. Plaintiffs and the other Class Members have all suffered harm and damages as a result of Defendant's wrongful conduct.

117. There are many questions of law and fact common to Plaintiffs and the Class Members, and those questions predominate over any questions that may affect individual Class

Members. Common questions for the Class include, but are not limited to the following:

      a.  whether Defendant's conduct described herein violates the federal Computer Fraud And Abuse Act; 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5);

      b.  whether Defendant's conduct described herein violates the California Computer Crime Law, Cal. Penal Code § 502;

      c.  whether Defendant's conduct described herein violates California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq.*;

      d.  whether Defendant's conduct described herein violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

      e.  whether Defendant's conduct described herein has resulted in acts of Conversion;

      f.  whether Defendant's conduct described herein has resulted in an Invasion of Privacy and Seclusion and Public Disclosure of Private Facts;

      g.  whether Defendant's conduct described herein has resulted in Trespass to Personal Property/ Chattels;

      h.  whether Defendant's conduct described herein has resulted in acts of Unjust Enrichment;

      i.  whether, as a result of Defendant's conduct, Plaintiffs and the Class have suffered damages; and if so the appropriate amount thereof; and

      j.  whether, as a result of Defendant's conduct, Plaintiffs and the Class are entitled to equitable relief, and/or other relief, and, if so, the nature of such relief.

118.  The questions of law and fact common to Class Members predominate over any questions affecting only individual members and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

**Count I**

**VIOLATION OF FEDERAL COMPUTER FRAUD AND ABUSE ACT**

**18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)**

119.    Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

120.    Plaintiffs assert this claim on behalf of themselves and the Class.

121.    Plaintiffs and Class Members have used their iPhones in interstate and/or foreign commerce.

122.    Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing a computer used for interstate commerce or communication, without authorization or by exceeding authorized access to such a computer, and by obtaining information from such a protected computer.

123.    Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A)(i) by knowingly causing the transmission of a program, information, code, or command and as a result causing a loss to one or more persons during any one-year period aggregating at least $5,000 in value.

124.    Plaintiffs and Class Members have suffered loss by reason of these violations.

125.    Plaintiffs and Class Members lost their copyright -- the actual, exclusive and personally-owned right to make a copy thereof, and to prevent others from making a copy. Hipster took that right away from iPhone users when it stole a copy of the contact address book and uploaded that data to its servers, where it enjoyed access to that copy as it pleased. This loss of the exclusive right to make and control rights over a copy of a copyrighted work is tangible, and subject to valuation, but in no case is the loss of this right worth less than $5.00 for each of the iPhone owners who had their contact address book copied without their permission by Hipster.

126.    Plaintiffs and Class Members lost any compensation for their investment of time, effort, skill, and creative energy used to build the user's unique contact address book, which has independent value as a result of the investment of time, effort, skill, and creative energy by

Plaintiffs and the members of the Class.  The investment made by a user to create their contact address book is substantial, and capable of valuation, based upon the time spent learning and building the contact address book, time spent creating and inputting data and information, the number of entries in the contact address book, and time spent modifying and updating the contact address book.

127.   Plaintiffs and Class Member are forced to retain an expert in order to obtain removal of the Hipster App from their iPhones.  The costs to hire a technician who can knowledgeably, effectively, completely, and permanently remove the Hipster App, and all its code, both disclosed and undisclosed, is substantial.  The knowledge required from such an operation is not easily obtained outside of Apple itself.  Thus, the false pretenses under which the Hipster App was downloaded, installed, and run on the user's iPhone caused actual harm to users in necessitating expert removal of the Hipster App and all of its code, both disclosed and undisclosed, from the iPhone in order to restore the iPhone to its previously secure state.

128.   Within the first year of its operation, Hipster's conduct similarly affected and caused the losses described above to hundreds of thousands of users.

129.   Defendant's unlawful access to Plaintiffs' and Class Members' computers and computer communications also have caused Plaintiffs and Class members irreparable injury.  Unless restrained and enjoined, Defendants will continue to commit such acts.  Plaintiffs' and Class members' remedy at law is not adequate to compensate them for these inflicted and threatened injuries, entitling Plaintiffs and Class Members to remedies including injunctive relief as provided by 18 U.S.C. § 1030(g).

130.   In addition, Plaintiffs and Class Members suffered economic damages.  Specifically, iPhone users lost value in what they paid for their iPhones, including but not limited to lost battery life, lost memory, lost storage space, lost bandwidth, and lost valuation to the iPhone itself in that Hipster's conduct impaired the functionality of the iPhone, rendering data stored thereon accessible and insecure.  Plaintiffs and Class Members seek a minimum recovery of $10.00 per iPhone for losses incurred by virtue of Hipster's conduct as described herein.  Plaintiffs and Class Members also seek, in addition to the economic losses described above, a

1  minimum recovery of $5.00 for their loss of copyright.

2  **COUNT II**

3  **VIOLATIONS OF CAL. PENAL CODE § 502,**

4  **The California Computer Crime Law ("CCCL")**

5  131.  Plaintiffs incorporate the above allegations by reference as if set forth herein at

6  length.

7  132.  Plaintiffs assert this claim on behalf of themselves and the Class.

8  133.  Defendant accessed, copied, used, made use of, interfered, and/or altered, data

9  belonging to Class members: (1) in and from the State of California; (2) in the home states of the

10  Plaintiffs; and (3) in the state in which the servers that provided the communication link between

11  Plaintiffs and the App were located.

12  134.  Cal. Penal Code § 502(j) states: "For purposes of bringing a civil or a criminal

13  action under this section, a person who causes, by any means, the access of a computer,

14  computer system, or computer network in one jurisdiction from another jurisdiction is deemed to

15  have personally accessed the computer, computer system, or computer network in each

16  jurisdiction."

17  135.  Defendant has violated California Penal Code § 502(c)(1) by knowingly and

18  without permission, altering, and making use of data from Plaintiffs and Class members iPhones

19  in order to wrongfully obtain valuable private data from Plaintiffs.

20  136.  Defendant has violated California Penal Code § 502(c)(1) by knowingly and

21  without permission, altering, and making use of data from Plaintiffs and Class members iPhones

22  in order to: (1) deceive Plaintiffs into surrendering unknowing control over their contact address

23  book and the information contained therein for Defendant's financial gain; and (2) deceive

24  Plaintiffs into accepting and downloading and using the Hipster App that contained undisclosed

25  code that would circumvent protections on the iPhone that were designed to keep information

26  therein safe, secure and private.

27  137.  Defendant has violated California Penal Code § 502(c)(2) by knowingly and

28  without permission, accessing and taking data from Plaintiffs' iPhones.

138.     Defendant has violated California Penal Code § 502(c)(6) by knowingly and without permission providing, or assisting in providing, a means of accessing Plaintiffs' and Class member's iPhones.

139.     Defendant has violated California Penal Code § 502(c)(7) by knowingly and without permission accessing, or causing to be accessed, Plaintiffs' and Class member's iPhones.

140.     Pursuant to California Penal Code § 502(b)(10)  a "'Computer contaminant' means any set of computer instructions that are designed to  . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information."

141.     The iPhone qualifies as and constitutes a computer.

142.     Defendant has violated California Penal Code § 502(c)(8) by knowingly and without permission introducing a computer contaminant into the iPhones of Plaintiffs class members, which transmitted the contact address book to Defendant's servers.

143.     As a direct and proximate result of Defendant's unlawful conduct within the meaning of California Penal Code § 502, Defendant has caused loss to Plaintiffs and Class Members in an amount to be proven at trial.

144.     Plaintiffs lost their copyright -- the actual, exclusive and personally-owned right to make a copy thereof, and to prevent others from making a copy.   Hipster took that right away from iPhone users when it stole a copy of the contact address book and uploaded that data to its servers, where it enjoyed access to that copy as it pleased. This loss of the exclusive right to make and control rights over a copy of a copyrighted work is tangible, and subject to valuation, but in no case is the loss of this right worth less than $5.00 for each of the iPhone owners who had their contact address book copied without their permission by Hipster.

145.     Plaintiffs lost any compensation for their investment of time, effort, skill, and creative energy used to build the user's unique contact address book, which has independent value as a result of the investment of time, effort, skill, and creative energy by Plaintiffs and the members of the Class.  The investment made by a user to create their contact address book is substantial, and capable of valuation, based upon the time spent learning and building the contact

address book, time spent creating and inputting data and information, the number of entries in the contact address book, and time spent modifying and updating the contact address book.

146.     Plaintiffs are forced to retain an expert in order to obtain removal of the Hipster App from their iPhones.  The costs to hire a technician who can knowledgeably, effectively, completely, and permanently remove the Hipster App, and all its code, both disclosed and undisclosed, is substantial.  The knowledge required from such an operation is not easily obtained outside of Apple itself.  Thus, the false pretenses under which the Hipster App was downloaded, installed, and run on the user's iPhone caused actual harm to users in necessitating expert removal of the Hipster App and all of its code, both disclosed and undisclosed, from the iPhone in order to restore the iPhone to its previously secure state.

147.     Within the first year of its operation, Hipster's conduct similarly affected and caused the losses described above to over 500,000 users.

148.     Plaintiffs are also entitled to recover their reasonable attorneys' fees pursuant to California Penal Code § 502(e).

149.     Plaintiffs and the Class Members seek compensatory damages: specifically, Plaintiffs and class members seek to recover the costs to retain an expert to insure the complete removal of all code installed by the Hipster App, while insuring that no data belonging to the iPhone user was not altered, damaged, or deleted by the Hipster's access, or will be placed at risk by the Hipster App's removal.  In no case will this cost be less than $5.00 per iPhone.

150.     Plaintiffs and Class Members have suffered irreparable and incalculable harm and injuries from Defendant's violations. The harm will continue unless Defendant is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

151.     Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendant's violations were willful and, on information and belief, Defendant is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

**COUNT III**

**TRESPASS TO PERSONAL PROPERTY / CHATTELS**

152.    Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

153.    Plaintiffs assert this claim on behalf of themselves and the Class.

154.    The common law prohibits the intentional intermeddling with personal property, including an iPhone, in possession of another which results in the deprivation of the use of the personal property or impairment of the condition, quality, or usefulness of the personal property.

155.    When users purchased their iPhones, it was with the understanding that the iPhone came with certain safeguards for privacy and security, both internal to the iPhone, and external, through the control of the Apple server, and Apple's strict control over its App Store. These protections were designed into the physical makeup of the iPhone, the programming and software the iPhone utilized, and the servers that supported the iPhone.  These protections extended to the Apps available through the Apple App Store, and Apple's control of the functionality of the apps offered.

156.     These safeguards for privacy and security are fundamental to the operation and functionality of the iPhone.

157.    The Hipster App, in circumventing all of these protections, and thereafter copying, transmitting, and retaining a copy of the contact address book "broke" these safeguards.

158.    Following the download and use of the Hipster App, the iPhone no longer functioned as it was designed.

159.    The iPhone was transformed from a secure device which would hold safe, and confidential the private and personal information related to the user's contacts, associations, relationships, and communications.   Once the Hipster App became part of the iPhone, the iPhone's use as a secure device which would hold safe, secure, and confidential the private and personal information related to the user's contacts, associations, relationships and communications was destroyed.

160.    The destruction of this aspect of the iPhone's operation and functionality left

First Amended Class Action Complaint

user's iPhones in an impaired condition, quality, and usefulness.

161.    The taking of the contact address book information constituted an irreparable injury, in that information that the user had created, complied, and assembled within the secure parameters of their single-owner iPhone was not for public distribution or for sharing with third parties.  The breach Hipster made in these walls of protection by and through code it surreptitiously inserted into its App permitted private and sensitive information which was securely ensconced within the built-in protections of the iPhone to become public, or publicly available, once transmitted by Defendant "in the clear" and without any encryption.  Information which was formerly for the "eyes only" of the iPhone owner thereafter became information available not only to the iPhone user, but also anyone at Hipster who cared to peruse the uploaded data or had access to it; as well as anyone who had access to open and unsecured web transmissions.

162.    Hipster's conduct directly and intentionally interfered with the intended function of the iPhone.

163.    Users would not have purchased Apple's iPhone, or alternatively, would not have paid as much for it, had they known that the Hipster App would be able to circumvent and impair both internal and external safeguards designed for the protection of their private and personal information residing on the iPhone.

164.    Without Plaintiffs' and Class Members' consent, or in excess of any consent given, Defendant knowingly and intentionally accessed Plaintiffs' and Class Members' property, thereby intermeddling with Plaintiffs' and Class Members' right to possession of the property and causing injury to Plaintiffs and the members of the Class.

165.    Defendant engaged in deception and concealment in order to gain access to Plaintiffs' and Class Members' iPhones.

166.    Defendant undertook the following actions with respect to Plaintiffs' and Class Members' iPhones:

        a.   Defendant accessed and obtained control over the user's iPhone;

        b.   Defendant caused the installation of a new code onto the memory of the user's

iPhone;

    c.  Defendant programmed the operation of its code to function and operate without notice or consent on the part of the owner of the iPhone, and outside of the control of the owner of the iPhone.

167. All these acts described above were acts in excess of any authority any user granted when they downloaded the Defendant's application and none of these acts was in furtherance of users viewing the Defendant application. By engaging in deception and misrepresentation, whatever authority or permission Plaintiffs and Class Members may have granted to Defendant was voided.

168. Defendant's installation and operation of its program used, interfered, and/or intermeddled with Plaintiffs' and Class Members' iPhones. Such use, interference and/or intermeddling was without Plaintiffs' and Class Members' consent or, in the alternative, in excess of Plaintiffs' and Class Members' consent.

169. Defendant's installation and operation of its program constitutes trespass, nuisance, and an interference with Plaintiffs' and Class Members' chattels, to wit, their iPhones.

170. Defendant's trespass to chattels, nuisance, and interference caused real and substantial damage to Plaintiffs and Class Members.

171. As a direct and proximate result of Defendant's trespass to chattels, nuisance, interference, unauthorized access of and intermeddling with Plaintiffs' and Class Members' property, Defendant has injured and impaired in the condition and value of Plaintiffs' and Class Members' iPhones.

172. Plaintiffs and Class Members suffered economic damages as a result of Hipster's trespass. Specifically, iPhone users lost value in what they paid for their iPhones, including but not limited to lost battery life, lost memory, lost storage space, lost bandwidth, and lost valuation to the iPhone itself in that Hipster's conduct impaired the functionality of the iPhone, rendering data stored thereon accessible and insecure. Plaintiffs and Class Members seek a minimum recovery of $10.00 per iPhone for losses incurred by virtue of Hipster's conduct as described herein. Plaintiffs and Class Members also seek, in addition to the economic losses described

First Amended Class Action Complaint

1    above, a minimum recovery of $5.00 for their loss of copyright.

2    173.    Plaintiffs and the Class Members seek compensatory damages to recover the costs

3    to retain an expert to insure the complete removal of all code installed by the Hipster App, while

4    insuring that no data belonging to the iPhone user was not altered, damaged, or deleted by the

5    Hipster's access, or will be placed at risk by the Hipster App's removal. Based on information

6    and belief, in no case will this cost be less than $5.00 per iPhone.

**COUNT IV**

7

**VIOLATIONS OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**

8

**Civil Code §§ 1750, *et seq.***

9

10    174.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

11    length.

12    175.    Plaintiffs assert this claim on behalf of themselves and the Class.

13    176.    The California Consumers Legal Remedies Act ("CLRA") applies to Hipster's

14    actions and conduct described herein because it extends to transactions that are intended to

15    result, or which have resulted, in the sale of a service to consumers.

16    177.    Hipster's App constituted a "service" under Section 1761(b) in that the Hipster

17    App permitted iPhone users to "Easily share where you are and what you're doing with postcards

18    of your photos." This sharing (web hosting of user's photographs, with accompanying

19    information, on Hipster's social website) was a service for purposes and within the meaning of

20    the CLRA.

21    178.    The utilization of this service was for personal, family, or household purposes,

22    and Plaintiffs and the members of the Class are "consumers" under Civil Code section 1761(d).

23    179.    Defendant Hipster has violated the CLRA in at least the following respects:

24        a.    In violation of Section 1770(a)(5), Defendant Hipster represented that the

25           Hipster App had characteristics, uses, and benefits it does not have.

26           Specifically, Hipster offered a service to "Easily share where you are and

27           what you're doing with postcards of your photos." Hipster did not disclose

28           that there were undisclosed costs to the use of the service, including the

First Amended Class Action Complaint

33

copying, transmission, and retention of the user's contact address book. Hipster engaged in a misrepresentation regarding the true nature of the App;

    b. In violation of Section 1770(a)(9), Defendant Hipster represented that the Hipster App was "free," when in fact, Hipster imposed an additional price which users were required to pay, but it did not disclose that this additional price was part of the transaction, and indeed, took steps to conceal the theft of the contact address book in "payment" for the Hipster service;

    c. In violation of Section 1770(a)(13), Defendant Hipster represented that the Hipster App was "free," which constitutes a price reduction, but in fact, the price was not "reduced." Users were required to pay, but Hipster took steps to conceal the "payment" for the Hipster service;

    d. In violation of Section 1770(a)(14), Defendant Hipster represented that the transaction with Hipster involved rights, remedies, or obligations which it does not have. Specifically, by representing that the App was "free," users were led to believe that they had all rights to use the Hipster App without further payment. Users were also led to believe that no further obligations would be necessary. Hipster unilaterally imposed these additional terms and obligations on the transaction, all without disclosure to consumers.

180. Defendant Hipster concealed material facts regarding the services it was providing. Had Defendant Hipster disclosed the information it concealed, it would have been made known to Plaintiffs and members of the Class.

181. Defendant Hipster's failure to disclose the truth about the Hipster App, its hidden function, concealed operations, and undisclosed costs, and Defendant's conscious concealment of those facts, are unfair, misleading, and deceptive trade practices under the provisions of the CLRA, California Civil Code §§ 1770 (a)(5), (9), (13), and (14).

182. Defendant's deceptive acts and omissions occurred in the course of selling a consumer product.

183. Plaintiffs and the members of the Class relied upon Defendant Hipster to provide

1  them with full and complete disclosure of the true facts concerning the services Hipster was

2  providing.  Defendant Hipster intentionally failed to inform Plaintiffs and the members of the

3  Class of the true nature of its services to their detriment.  Plaintiffs and the members of the Class

4  have all been directly and proximately injured by Defendant's conduct, and such injury includes

5  the losses described herein.  Plaintiffs and the members of the Class would not have downloaded

6  the Hipster App had they known the truth about its true costs.

7  184.   Plaintiffs, on behalf of themselves and each member of the Class, seek restitution,

8  injunctive relief, and other equitable relief allowed under section 1750, et seq.

9  185.   On information and belief, or about March 2012, Hipster was purchased by AOL

10  for a sum in excess of one million dollars.  This million dollar plus valuation was due, in whole

11  or in part, to Hipster's theft and acquisition of hundreds of thousands of user's contact address

12  books, which included millions of email addresses.  Hipster did not disclose to iPhone owners

13  that it was taking this information, and Hipster never compensated users for the taking of this

14  data.

15  186.   It would be inequitable to permit Hipster to retain its ill-gotten gains, or the

16  profits it realized by engaging in this unlawful conduct.

17  187.   Plaintiffs, on behalf of themselves and the Class, seek restitution in the form of all

18  Hipster valuation that may be attributable to Hipster's theft and acquisition of hundreds of

19  thousands of user's contact address books.

20  188.   Plaintiffs, on behalf of themselves and the Class, seek disgorgement in the form

21  of all Hipster benefits and profits such as may be necessary to deter future violations of the

22  unfair trade practice statute.

23  189.   Plaintiffs expressly disclaim at this time any damages pursuant to this Civil Code

24  section.

**COUNT V**

25

26  **VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),**

27  **Cal. Business and Professions Code §§ 17200, *et seq.***

28  190.   Plaintiffs incorporate the above allegations by reference as if set forth herein at

length.

191.    Plaintiffs bring this cause of action on behalf of themselves, and in their capacity as private attorneys general.

192.    Defendant Hipster's actions, as complained of herein, constitute unfair, deceptive, and/or unlawful practices committed in violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 et seq.

193.    Defendant Hipster engaged in unlawful business practices by, among other things:

    a.  Engaging in conduct, as alleged herein, that violates Cal. Penal Code § 502;

    b.  Engaging in conduct, as alleged herein, that violates California Civil Code §§ 1750 *et seq.*, which seeks to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace;

    c.  Engaging in conduct, as alleged herein, that violates Article I, Section 1 of the California Constitution; and

    d.  Engaging in conduct, as alleged herein, that violates the federal Computer Fraud and Abuse Act: 18 U.S.C.  §§ 1030(a)(2)(C) & (a)(5).

194.    Defendant Hipster engaged in unfair business practices by, among other things:

    a.  Engaging in conduct where the utility of that conduct is outweighed by the gravity of the consequences to Plaintiffs and Class members;

    b.  Engaging in conduct that is immoral, unethical, unscrupulous or substantially injurious to Plaintiffs and Class members;

    c.  Engaging in conduct that undermines or violates the stated policies underlying the CLRA, which seeks to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace; and

    d.  Engaging in conduct that undermines or violates the stated policies underlying Cal. Penal Code § 502; Article I, Section 1 of the California Constitution; and

First Amended Class Action Complaint

1 the federal Computer Fraud and Abuse Act: 18 U.S.C. §§ 1030(a)(2)(C) &

2 (a)(5).

3  195. Defendant Hipster engaged in fraudulent business practices by engaging in

4 conduct that was and is likely to deceive consumers acting reasonably under the circumstances.

5 Defendant's fraudulent business practices include, but are not limited to:

6  a. Failing to disclose the truth about what the Hipster App was, how it worked,

7  and what it would do.  What was portrayed by Hipster as an App to share

8  pictures, in fact, concealed what was essentially a Trojan horse which engaged

9  in surreptitious data collection practices immediately upon being downloaded

10  upon a user's iPhone.  Users who sought to obtain a photo sharing App ended

11  up with a program on their iPhones that undertook actions that were never

12  disclosed to the iPhone users.  Users were never informed that the App would

13  make a copy of their contact address book, upload that address book to

14  Hipster's servers, and that Hipster would retain and use a copy of that secretly

15  acquired information;

16  b. When Hipster represented that the app was "free," it was engaging in a

17  misrepresentation.  The App was designed to hide the true price users would

18  pay.  In exchange for the Hipster App, users were required to relinquish a

19  copy, and surrender their copyright of their contact address book, a transaction

20  to which they would not have permitted had they been informed of the truth

21  about the real cost of the Hipster App;

22  c. When Hipster represented that the download was "free," it was engaging in a

23  misrepresentation.  The download included within it a mechanism for

24  extracting a price from the user (the user's contact address book).  All of this

25  was undisclosed and the user was not given all information necessary to fairly

26  and honestly evaluate whether the App was really worth the download.  Thus,

27  the download was not free.  The download was specifically designed to hide

28

the fact that a price was being extracted from the user without the user's knowledge or consent.

196.     As a direct and proximate result of Defendant Hipster's unlawful, unfair, and fraudulent acts, business practices, and conduct, Plaintiffs and Class members have suffered injury in fact and lost money as a result of Defendants Hipster's practices in that, among other things:

      a.  Plaintiffs lost their copyright -- the actual, exclusive and personally-owned right to make a copy thereof, and to prevent others from making a copy. Hipster took that right away from iPhone users when it stole a copy of the contact address book and uploaded that data to its servers, where it enjoyed access to that copy as it pleased. This loss of the exclusive right to make and control rights over a copy of a copyrighted work is tangible, and subject to valuation, but in no case is the loss of this right worth less than $5.00 for each of the iPhone owners who had their contact address book copied without their permission by Hipster.

      b.  Plaintiffs lost any compensation for their investment of time, effort, skill, and creative energy used to build the user's unique contact address book, which has independent value as a result of the investment of time, effort, skill, and creative energy by Plaintiffs and the members of the Class.  The investment made by a user to create their contact address book is substantial, and capable of valuation, based upon the time spent learning and building the contact address book, time spent creating and inputting data and information, the number of entries in the contact address book, and time spent modifying and updating the contact address book.

      c.  Plaintiffs are forced to retain an expert in order to obtain removal of the Hipster App from their iPhones.  The costs to hire a technician who can knowledgeably, effectively, completely, and permanently remove the Hipster App, and all its code, both disclosed and undisclosed, is substantial.  The

knowledge required from such an operation is not easily obtained outside of Apple itself.  Thus, the false pretenses under which the Hipster App was downloaded, installed, and run on the user's iPhone caused actual harm to users in necessitating expert removal of the Hipster App and all of its code, both disclosed and undisclosed, from the iPhone in order to restore the iPhone to its previously secure state.

197.   All of the conduct alleged herein occurred in the course of Defendant's business. Defendant's wrongful conduct was part of a pattern or generalized course of conduct repeated on hundreds of thousands of occasions.

198.   Plaintiffs, on behalf of themselves and each member of the Class, seek restitution, injunctive relief, rescission, and other relief allowed under section 17200, et seq.

199.   On information and belief, or about March 2012, Hipster was purchased by AOL for a sum in excess of one million dollars.  This million dollar plus valuation was due, in whole or in part, to Hipster's theft and acquisition of hundreds of thousands of user's contact address books, which included millions of email addresses.  Hipster did not disclose to iPhone owners that it was taking this information, and Hipster never compensated users for the taking of this data.

200.   It would be inequitable to permit Hipster to retain its ill-gotten gains, or the profits it realized by engaging in this unlawful conduct.

201.   Plaintiffs, on behalf of themselves and the Class, seek restitution in the form of all Hipster valuation that may be attributable to Hipster's theft and acquisition of hundreds of thousands of user's contact address books.

202.   Plaintiffs, on behalf of themselves and the Class, seek disgorgement in the form of all Hipster benefits and profits such as may be necessary to deter future violations of the unfair trade practice statute.

**COUNT VI**

**CONVERSION**

203.   Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

204.   Plaintiffs assert this claim behalf of themselves and the Class.

205.   Plaintiffs and Class Members are owners of the exclusive right to access, copy, modify, and/or transmit their contact address book information.  Their contact address book information was compiled, organized, built, maintained, and updated by each iPhone owner individually.  Each iPhone owner had both a copyright and an ownership interest in their contact address book as a result of their having compiled, organized, built, maintained, and updated the contact address book.  They alone had exclusive discretion and control over access and use of the contact address book.  Such property, owned by the Plaintiffs and Class Members, is valuable to the Plaintiffs and Class Members.

206.   When Hipster, without notification or permission, accessed, copied, modified, and/or transmitted the contact address book information belonging to iPhone users, it destroyed the exclusive rights of possession that the iPhone users formerly held.

207.   Defendant unlawfully exercised dominion over said property and thereby converted Plaintiffs' and Class Members' property, by a copy of that which exclusively belonged to the iPhone users.

208.   Plaintiffs and Class Members were damaged thereby.

209.   Plaintiffs and Class Members suffered economic damages as a result of Hipster's trespass.  Specifically, iPhone users lost value in what they paid for their iPhones, including but not limited to lost battery life, lost memory, lost storage space, lost bandwidth, and lost valuation to the iPhone itself in that Hipster's conduct impaired the functionality of the iPhone, rendering data stored thereon accessible and insecure.  Plaintiffs and Class Members seek a minimum recovery of $10.00 per iPhone for losses incurred by virtue of Hipster's conduct as described herein.  Plaintiffs and Class Members also seek, in addition to the economic losses described above, a minimum recovery of $5.00 for their loss of copyright.

First Amended Class Action Complaint

40

210.     Plaintiffs and the Class Members seek compensatory damages to recover the costs to retain an expert to insure the complete removal of all code installed by the Hipster App, while insuring that no data belonging to the iPhone user was not altered, damaged, or deleted by the Hipster's access, or will be placed at risk by the Hipster App's removal.  In no case will this cost be less than $5.00 per iPhone.

**COUNT VII**

**INVASION OF PRIVACY AND SECLUSION AND**

**PUBLIC DISCLOSURE OF PRIVATE FACTS**

211.     Plaintiffs incorporate the above allegations by reference as if set forth herein at length.

212.     Plaintiffs assert this claim on behalf of themselves and the Class.

213.     Plaintiffs have a legally protected privacy interest in their contacts, their communications, their relationships, and their associations.  Plaintiffs have a reasonable expectation of privacy with respect to their contacts, their communications, their relationships, and their associations.

214.     Each of these legally protected privacy interests are contained within their contact address books in their iPhones. Contact address book information may include, for purposes of illustration, an iPhone user's contacts, connections, associations, and relationships with: psychiatrists; plastic surgeons; abortion clinics; AIDS treatment centers; strip clubs; criminal defense attorneys; motels; unions; mosques; synagogues or churches; dating services, etc.

215.     An outsider's acquisition of an iPhone user's contact address book results in the direct exposure of a user's contacts, communications, relationships, and associations.  In fact, the contact address book is their contacts, communications, relationships, and associations. Plaintiffs and the Class have the right to conduct their contacts, communications, relationships, and associations without observation, intrusion, oversight, or interference.

216.     Defendant Hipster acquired the contacts, communications, relationships, and associations of Plaintiffs and the Class when Hipster acquired their contact address books. Hipster effectuated this acquisition without knowledge or consent on the part of the iPhone

owner.

217.  Hipster's conduct, which by design allowed Hipster to steal a copy of the personal information of Plaintiffs and the Class, is not a standard, legitimate commercial practice. Rather it is an egregious breach of industry standards, social norms, and is prohibited by law.

218.  Plaintiffs' and the Class Members' private contact address book data is not a matter of legitimate public concern. Therefore, publicizing, disseminating, exposing or surreptitiously obtaining Plaintiffs' and Class Members' private contact address book data from their iPhones is and will continue to be regarded as highly offensive and objectionable to reasonable people, especially where, as here, the commission of a crime (i.e., the illegal and unauthorized accessing of a computer and copying and use of its data) was necessary for Defendant to first acquire the contact address book data.

219.  As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and Class Members have suffered harm as a result of their personal information being copied, acquired, and stored without consent.

220.  Plaintiffs and the Class Members were, and continue to be, damaged as a direct and/or proximate result of Defendant's invasion of their privacy by the public disclosure (transmission "in the clear") of their private facts – the contents of their private contact address books from their iPhones. Plaintiffs and the Class members are entitled to recover actual and nominal damages. Such damages include: recovery for the losses alleged above; expenses for securing their iPhones from another similar invasion of privacy, costs associated with re-securing the data and their iPhones and computing devices, and procuring and verifying the removal, deletion and scrubbing of the data and data points from the Defendant's records, computers and systems, out-of-pocket expenses, and other economic and non- economic harm, for which they are entitled to compensation.  In no case will this cost be less than $5.00 per iPhone.

221.  Plaintiffs and Class Members lost value in what they paid for their iPhones, including but not limited to lost battery life, lost memory, lost storage space, lost bandwidth, and lost valuation to the iPhone itself in that Hipster's conduct impaired the functionality of the iPhone, rendering data stored thereon accessible and insecure.  Plaintiffs and Class Members

1   seek a minimum recovery of $10.00 per iPhone for losses incurred by virtue of Hipster's conduct

2   as described herein.  Plaintiffs and Class Members also seek, in addition to the economic losses

3   described above, a minimum recovery of $5.00 for their loss of copyright.

4        222.    Plaintiffs and Class Members additionally seek declaratory and injunctive relief to

5   prevent Defendants from continuing to track and expose their information.

6   **COUNT XIII**

7   **COMMON LAW COUNTS OF UNJUST ENRICHMENT**

8   **ASSUMPSIT, AND RESTITUTION**

9        223.    Plaintiffs incorporate the above allegations by reference as if set forth herein at

10  length.

11       224.    Plaintiffs assert this claim on behalf of themselves and the Class.

12       225.    A benefit has been conferred upon Defendant by Plaintiffs and the Class.

13  Defendant received and retained information regarding Plaintiffs and the Class, specifically their

14  contact address book data, which includes valuable and personal contact, connection,

15  relationship, and association information amounting to millions of entries.

16       226.    This information is otherwise private, confidential, and not of public record.

17       227.    Hipster has profited from the theft of this information.

18       228.    On information and belief, and Plaintiffs thereupon alleges, the value of the

19  contacts and connections Hipster acquired by stealing the contact address books of hundreds of

20  thousands of its customers was instrumental in achieving a multi-million dollar valuation of the

21  company.  AOL paid in excess of $1 million to purchase the company.  On information and

22  belief, and Plaintiffs thereupon alleges, the value of the contacts and connections Hipster

23  acquired by stealing the contact address books of millions of its customers was instrumental in

24  achieving that $1 million plus valuation.

25       229.    Defendant appreciates and has knowledge of said benefit.

26       230.    As a direct result of the misconduct alleged herein, Hipster has been unjustly

27  enriched and has obtained a substantial monetary benefit which, in fairness and equity, Hipster

28  was not entitled to receive or retain.

231.     It would be unfair and inequitable to allow Hipster to retain the benefits derived from theft of the contact address book information from Plaintiffs and the Class and therefore Plaintiffs and the Class are entitled to be paid and to receive those benefits.

232.     Under principles of equity and good conscience, Defendant should not be permitted to retain the information and/or revenue which they acquired by virtue of their unlawful conduct.  All funds, revenues, and benefits received by Defendant rightfully belong to Plaintiffs and the Class, which Defendant has unjustly received as a result of its actions.

233.     Plaintiffs request that judgment be granted against Hipster in an amount that is equivalent to the sum total amount that AOL paid to purchase Hipster, together with prejudgment interest as provided by law, and that Plaintiffs receive such other relief as the Court deems proper and just under the circumstances, payment of costs and expenses' incurred in filing this suit, and reasonable attorney's fees.

234.     Under common law principles recognized in claims of common counts, unjust enrichment, restitution and/or assumpsit, Defendant should not be permitted to retain the benefits conferred upon it based on the taking of such data from Plaintiffs and Class Members and converting it into revenues and profits without providing compensation therefore.

235.     Under principles of equity and good conscience, Defendant should not be permitted to retain the information and/or revenue that it acquired by virtue of its unlawful conduct.  All funds, revenues, and benefits received by Defendant rightfully belong to Plaintiffs and the Class, which Defendant has unjustly received as a result of its actions.

236.     On information and belief, or about March 2012, Hipster was purchased by AOL for a sum in excess of one million dollars.  This million dollar plus valuation was due, in whole or in part, to Hipster's theft and acquisition of hundreds of thousands of user's contact address books, which included millions of email addresses.  Hipster did not disclose to iPhone owners that it was taking this information, and Hipster never compensated users for the taking of this data.

237.     It would be inequitable to permit Hipster to retain its ill-gotten gains, or the profits it realized by engaging in this unlawful conduct.

First Amended Class Action Complaint

238.     Plaintiffs, on behalf of themselves and the Class, seek restitution in the form of all Hipster valuation that may be attributable to Hipster's theft and acquisition of hundreds of thousands of user's contact address books.

239.     Plaintiffs, on behalf of themselves and the Class, seek disgorgement in the form of all Hipster benefits and profits such as may be necessary to deter future violations of the unfair trade practice statute.

240.     Plaintiffs, on behalf of themselves and the Class, seek damages and restitutionary disgorgement of all profits or monies generated from such illegal acts, and the establishment of a constructive trust from which Plaintiffs may seek restitution as to all such funds, revenues and benefits that Defendant has unjustly received as a result of its actions that rightfully belong to Plaintiffs.

241.     Plaintiffs also seek declaratory relief as to the rights and responsibilities of all parties to such implied-at-law agreements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and, where applicable, the Sub-Classes, pray for judgment against Defendant granting the following relief:

a.   An order certifying this case as a class action and appointing Plaintiffs' counsel to represent the Class;

b.   On the First Count:

i.   $10.00 per each of Class Members' affected iPhone in compensatory damages and losses sustained to the iPhone by Hipster's conduct;

ii.   $5.00 per iPhone in compensatory damages for loss and theft of copyright;

c.   On the Second Count:

i.   $10.00 per iPhone in compensatory damages and losses sustained to the iPhone by Hipster's conduct;

ii.   $5.00  per iPhone in compensatory damages for removal of the offending App;

iii.   $5.00 per iPhone in compensatory damages for loss and theft of copyright;

1     iv.   Punitive and/or exemplary damages;

2     d.   On the Third Count:

3          i.   $10.00 per iPhone in compensatory damages and losses sustained to the
4               iPhone by Hipster's conduct;

5          ii.   $5.00  per iPhone in compensatory damages for removal of the offending
6                App;

7          iii.   $5.00 per iPhone in compensatory damages for loss and theft of copyright;

8     e.   On the Fourth Count:

9          i.   Disgorgement of all amounts obtained by Hipster, its owners and investors
10              as a result of its misconduct, but no amount less than the total valuation
11              Paid by AOL for the Hipster purchase or acquisition;

12    f.   On the Fifth Count:

13         i.   Disgorgement of all amounts obtained by Hipster, its owners and investors
14              as a result of its misconduct, but no amount less than the total valuation
15              Paid by AOL for the Hipster purchase or acquisition;

16    g.   On the Sixth Count:

17         i.   $10.00 per iPhone in compensatory damages and losses sustained to the
18              iPhone by Hipster's conduct;

19         ii.   $5.00  per iPhone in compensatory damages for removal of the offending
20               App;

21         iii.   $5.00 per iPhone in compensatory damages for loss and theft of copyright;

22    h.   On the Seventh Count:

23         i.   $10.00 per iPhone in compensatory damages and losses sustained to the
24              iPhone by Hipster's conduct;

25         ii.   $5.00  per iPhone in compensatory damages for removal of the offending
26               App;

27         iii.   $5.00 per iPhone in compensatory damages for loss and theft of copyright;

28    i.   On the Eighth Count:

First Amended Class Action Complaint

1         i.  Disgorgement of all amounts obtained by Hipster, its owners and investors

2           as a result of its misconduct, but no amount less than the total valuation

3           Paid by AOL for the Hipster purchase or acquisition;

4     j.  On <u>All</u> Counts:

5         i.  Restitution and disgorgement of all amounts obtained by Hipster as a

6           result of its misconduct, together with interest thereon from the date of

7           payment, to the victims of such violations;

8       ii.  All recoverable compensatory and other damages sustained by Plaintiffs

9           and the Class;

10     iii.  Actual and/or statutory damages for injuries suffered by Plaintiffs and the

11           Class in the maximum amount permitted by applicable law;

12     iv.  An order (1) requiring Hipster to immediately cease its wrongful conduct

13           as set forth above; (2) enjoining Hipster from continuing to conceal

14           material information and conduct business via the unlawful, unfair and

15           deceptive business acts and practices complained of herein; (3) ordering

16           Hipster to engage in a corrective notice campaign; and (4) requiring

17           Hipster to refund to Plaintiffs and all members of the Class the funds

18           Hipster derived, direct or indirect, as a result of its unlawful conduct;

19      v.  Statutory pre-judgment and post-judgment interest on any amounts;

20     vi.  Payment of reasonable attorneys' fees and costs as may be allowable

21           under applicable law; and

22    vii.  Such other relief as the Court may deem just and proper.

23  Dated: May 24, 2013               Respectfully submitted,

24

25                      By: _____

26                          DAVID C. PARISI
One of the Attorneys for Plaintiff, individually and

27                          on behalf of Class of similarly situated individuals

28

David C. Parisi, Esq. (162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (188814)
shavens@parisihavens.com
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
Telephone: (818) 990-1299

Alan Himmelfarb (90480)
The Law Offices of Alan Himmelfarb
80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA 91024
Telephone: (626) 325-3104
consumerlaw1@earthlink.net

Joseph H. Malley (not admitted)
malleylaw@gmail.com
Law Office of Joseph H. Malley
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100

First Amended Class Action Complaint

**JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: May 24, 2013                              Respectfully submitted,

By: _____
                                   DAVID C. PARISI
One of the Attorneys for Plaintiff, individually and
on behalf of Class of similarly situated individuals

David C. Parisi, Esq. (162248)
dparisi@parisihavens.com
Suzanne Havens Beckman (188814)
shavens@parisihavens.com
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
Telephone: (818) 990-1299

Alan Himmelfarb (90480)
The Law Offices of Alan Himmelfarb
80 W. Sierra Madre Blvd., # 304
Sierra Madre, CA 91024
Telephone: (626) 325-3104
consumerlaw1@earthlink.net

Joseph H. Malley (not admitted)
malleylaw@gmail.com
Law Office of Joseph H. Malley
1045 North Zang Blvd
Dallas, TX 75208
Telephone: (214) 943-6100

First Amended Class Action Complaint